And we'll turn to the last case on our day calendar, Richard Reynolds v. Angel Quiroz et al, number 19-2858-PR. May I proceed, Your Honor? Yes, indeed. Who is this? This is Steven Strom, Assistant Attorney General. May it please the Court. Your Honor, it's good to hear your voice again. I'm arguing for New Haven Connecticut. I'm an Assistant Attorney General. Yes, Your Honor? Go ahead. Thank you, Your Honor. I'm an Assistant Attorney General. I represent the defendants, appellants, Connecticut prison officials, Angel Quiroz, and the remaining states of Connecticut Department of Correction, present or former officials and employees. With the Court's permission, I would like to reserve five minutes for rebuttal. Ms. Rodriguez told me I had three, Your Honor, but I'd like to ask. That's all right. Five will do. Thank you, Your Honor. The District Court summary judgment and permanent injunction order should be vacated for three reasons, Your Honor. There were material facts in dispute. That's the first reason. Second, the Court erred in denying qualified immunity. And third, the permanent injunction order is overly broad and intrusive and in violation of the Prison Litigation Reform Act. The parties' Rule 56 statements in this case, according to the rules of the District of Connecticut, the parties have to file Rule 56A1 and 56A2 controverting statements with pinpoint citations to admissible evidence, constituted approximately 800 paragraphs. And Your Honor, fully half of those paragraphs were in dispute or objected to. That's 400 of the 800 paragraphs were disputed and denied. And those are in the record at 1681 through 1862 of the joint appendix. The District Court in finding that there were and made findings of facts where the facts were in dispute and made credibility findings, which is not permissible on summary judgment. And among the facts that the District Court found were one, that Mr. Reynolds was in solitary confinement, ignoring the declaration of Dr. Sadoff, ignoring the sworn deposition testimony of Dr. Frayne. The very second sentence of the decision says that Mr. Reynolds' confinement was the most restrictive housing in the Connecticut Department of Correction, which is not at all true. The District Court found he only had 15 minute breaks for lunch and dinner. That was not true. At numerous instances in the District Court's opinion, the court referred to social isolation, extreme isolation, and on and on and on. When in fact, for three hours a day, Mr. Reynolds was socializing with other inmates, going to the outside yard, going to the day room, eating at tables with other inmates, playing cards, playing cards where the loser of the card game would go down and do push-ups and pay his debt in push-ups. This was all observed by Dr. Sadoff when he had his expert tour and he put it in his expert report. And it was wholly disregarded by the District Court. There were photos of Mr. Reynolds' cell. They're in color in the District Court docket sheet at 117-6, that's ECF 117-6. In the joint appendix at 160 through 168, they're in black and white. Mr. Reynolds at the joint appendix 1813 admits this truly depicts his cell. You could see his cell has general population conditions. He has TV, he has radio, he has audio books, he has video games, he has headphones. He has all kinds of written material, paper materials, all kinds of sensory stimulation, quite the opposite of what all the studies on solitary confinement, the scientific literature and all that. That's all based on people who are in cells that have no property, no sensory deprivation, true isolation, none of that exists in the Connecticut Department of Correction for special circumstances. Mr. Reynolds was not denied humane conditions of confinement. He had food, clothing, shelter. He had no plumbing problems to the extent the District Court relied on plumbing. Those were all disputed by the defendant's admissible affidavit. He had numerous periodic due process reviews of his classification. There were so many numerous disputed issues I would take up all of my 10 minutes to describe them to the court. The District Court also erred on the law. For example, at special appendix page 19, the memorandum of decision, the District Court talks and uses the phrase, the defendant knew or reasonably should have known of the serious risk of harm to Mr. Reynolds. That is clearly erroneous as a matter of law. Under Farmer v. Brennan, 511 U.S. 837, the defendants must be aware of facts from which an inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference. We know that Dr. Frayne, the prison psychologist at Northern Corrections, did not draw any inference, observed Mr. Reynolds socializing, did not determine Mr. Reynolds was in any kind of social isolation or solitary confinement. The Dr. Sadoff, who was an experienced expert, had been to the Florence ADX, the Federal Bureau of Prisons' maximum security prison in Florence, Colorado. He'd also toured and had been in the tombs and special administrative measures cells for housing terrorists. Dr. Sadoff knows what solitary confinement is, and he concluded that Connecticut's conditions do not amount to solitary confinement. With regard to the due process claims in the case, Your Honor, under this court's decision in Welch v. Bartlett, 196 F-3rd at 392-93, if a prisoner experiences a deprivation under mandatory rules, he has no actionable due process claim if other prisoners experience the same deprivation in the ordinary administration of the prison. At the time of this case, all death row inmates went to death row, and all the death row inmates, as an ordinary matter of the administration of death row, experienced the same conditions. There is no constitutional right to go to general population. There is no constitutional right to any particular prison class occasion. The prison officials at the time had a Fourth Circuit case that predated the Porter v. Clark case, where the Fourth Circuit found that it was permissible, based on the sense of death from the court, for a person to be assigned to death row. The district court also heard, as a matter of law, at page 31, where the court said that it was Mr. Reynolds' original conviction, and the defendant's reliance on that conviction to place him in death row or in special circumstances was not a reasonable reliance. But the district court cites to absolutely no authority for that proposition, and quite frankly, there is none. Your Honors, with regard to the qualified immunity argument, the district court's generalized and conclusory analysis of qualified immunity cannot be defended. Under city of Escondido, the defendant's brief is 55, and in this court's recent decision in Francis v. Siaco, we know that under Francis, the constitutional question has to be beyond debate, and that's citing White v. Cauley from the Supreme Court. The question has to be clear enough such that every reasonable official would interpret it to establish the particular rule that the plaintiff seeks to apply. The district court relied on administrative segregation cases, Your Honors. Wilkinson and this court's decision in Colon v. Howard, but those two cases are inapposite. Those cases deal with administrative segregation. Administrative segregation is a status that is described in the Third Circuit's case, which is cited in the brief, Williams v. Secretary of Pennsylvania Department of Corrections. Administrative segregation meant that inmates, and this is at 561, 848 F. 3rd, 561. Administrative custody meant inmates were not allowed to have radio, television, telephone calls, personal property, except for writing materials, books, other than legal materials and personal religious volume or book. So the district court's conclusion that these were the most restrictive conditions in comparing the conditions here on death row to administrative segregation. Every reasonable prison official would know that the conditions Mr. Reynolds was in was not administrative segregation, yet the district court extrapolated from the Williams case, from the Wilkinson case, Your Honor, and found that it was clearly established law. There is no such law either in this circuit or in the United States Supreme Court that describes the due process procedures that apply in this case. And the right has to be clear and particularized to the facts and circumstances of the case. Lastly, the permanent injunction order, Your Honor, is grossly intrusive, overly broad, and quite frankly, when looking at the permanent injunction order, for example, paragraph two at special appendix 59, a very simple remedy- One more minute. Thank you, Maria. That would comply with this order. Mr. Reynolds cannot be alone in the cell. Simply double-selling Mr. Reynolds would remedy that order. There is no constitutional requirement that Mr. Reynolds be out of his cell more than 21 hours a day, yet the district court found 21 hours to be a bright line. The district court erred in saying that Mr. Reynolds could not be kept on high security status. For example, if he escaped tomorrow, the commissioner, if this order were in effect, would not be able to put Mr. Reynolds on high security status. And the conditions for high security status are reasonably related to detecting contraband, preventing escapes, and so forth. So for all those reasons, Your Honor, the summary judgment should be vacated and the permanent injunction order should be vacated in the case. Either judgment should be directed for the defendant or the case should be remanded for further factual findings. Thank you. Thank you, Mr. Strom. Judge Keirs? No questions. Judge Hall. Yes, Mr. Strom, excuse me. There obviously is much briefing on the issue of solitary confinement, and I want to make sure I understand the state's position in this regard. Is it the position that solitary confinement, sorry, that if this is, only if this is viewed as solitary confinement, can it be, can it become, and I know you dispute that it is, but can it become a potential Eighth Amendment violation? Well, that's correct, Your Honor. If, for example, So we have to, sorry, well, let me start there and then I'll let you continue, of course. So we have to sort of, that's the switch that has to get flipped first  I would agree, Your Honor. I would say in this case, the conditions, first of all, are quite in dispute. So that, but the district court, for example, relied on, at page two of the decision, on a study from the Yale Law School. And as Judge Febronius is aware, there's the Jerome and Frank Legal Services. Attorney Dignam used to work there. This is a group of prisoner who advocate for the abolition of solitary confinement. This is a hearsay report, not based on any admissible evidence that surveys sort of, quote unquote, solitary confinement. The district court did not define in the first sentence what it is, what solitary confinement is. The Lyman study talks about, in page two of the decision, 22 hours or more per day in cell, yet the record showed that Reynolds was out of cell for three hours and was only in cell for 21 hours. Now he's out of cell for about four and a half or five hours a day. And there's no description of all the amenities and privileges that he has by having a single cell. So that is hotly in dispute, which goes back to the first reason why the judgment should be reversed, Your Honor, because there were many material facts in dispute. And on this record, under this court's decision in Piesco v. City of New York, all the instances, and if there's any doubt about the instances, have to be taken in favor of the prison officials. So we would claim that it was error to find in the very first sentence of the decision that Reynolds was in solitary confinement. But then as a matter for us to consider, this court to consider, we don't look at the individual indicia that the district court relied on for its conclusion that there was solitary confinement, whether or not we agree with that term. So we don't get to go down to the steps that led the court to conclude that it was solitary confinement. Well, the district court simply sort of tracked and took into account this sort of numerical definition. And I think that's sort of indicated by the paragraph two of the permanent injunction order. It seems to draw a bright line at 21 hours because paragraph two of the permanent injunction order, Your Honor says, the defense are enjoined from imposing on Reynolds the conditions of more than 21 hours per day alone in the cell. So I think the district court defined it as any prison conditions where an individual is in a single cell for 21 hours more per day. But that has no constitutional underpinning. It just doesn't make any sense. Under the PLRA, a remedy can only extend to remedy a constitutional. And as Your Honors know from our brief, prior to this case, Judge Shotney had toured Northern in the death row area in the Webb case and had found no Eighth Amendment violation and the conditions were material the same. That's in the defendant's brief at page 60, Webb v. Rowlands, the Connecticut Supreme Court. That was a 2003 case. In 1982, Airy versus Warden said the conditions where it was one hour a day, 23 hours. Now I understand the Eighth Amendment has an evolving standard of decency. And there is, and we know that from the Williams case in the Third Circuit and the Park case in the Fourth Circuit, that there is a trend to believe this psychological evidence that Dr. Grassian put forward. But our position was that Dr. Grassian's methodology and reliability should be subject, is at issue and should be subject to a real trial where he could be cross-examined and it's in dispute. So the case should be reversed. So if, is the state's position then that if this were, if the decision were vacated and it were remanded for trial and the findings came out as they, as they are now, that that would be different? That a different result would obtain? Well, that's part of the problem because we have a district judge who seems to predetermine credibility issues on summary judgment. No, no, I understand. I'm asking you if it goes back and there's a trial or there is an evidentiary hearing, this is a matter regarding the issuance of an injunction. So it would be a trial to court. And the judge comes, having heard all the evidence, live testimony and rebuttal witnesses, et cetera, from the state, reaches the same conclusion. Is he wrong still? No, because after a trial, I think a district court judge could make credibility findings. Right, so if he agrees with the expert after a trial and hearing it and puts together the same factors that he has said are not in dispute now, and of course the state disagrees with that, then there's no problem with the injunction, right? There's still a problem with the injunction because it's overly broad, but at least it would be based on credibility findings. We think that no reasonable fact finder after having this expert cross-examined could come to the same conclusion. I totally understand. Been there, done that before I was on the bench. So let me ask you then, what is overly broad about it? How would you pare it down in order to, on my hypothetical, assuming that the district court went and found the facts that are in dispute in the way that I've indicated, you and I have agreed, then what kind of order gets entered that is acceptable? I think the only order would be a simple order that says the commissioner of corrections is enjoined from enforcing Connecticut General Statute 1810B against Mr. Reynolds and that portion of paragraph four which says that Mr. Reynolds should be classified using the same procedures that are used for any other prisoner, that would be the order, that he would be classified no differently than any other inmate with regard to his seven objections objective risk factors, his seven objective need factors, objective factor subjects, and they would classify Mr. Reynolds in a way that's appropriate to both his risk to staff and public safety as well as his mental health needs, medical needs, education. So that's how every Connecticut is classified and assigned. All right, but he, Mr. Reynolds and others in a similar situation aren't, I'm making a statement, but it's a question, aren't now classified, correct? Because the state's view is that the state or the facility has no discretion in the matter. Is that, do I understand that correctly? There is some discretion, Your Honor, under 1810B, for example, if the commissioner determines under the section that an individual may need, for example, protective custody placement, under and that's special appendix 74, where the statute is under sub B. Right. The classification process, if the inmate requires administrative segregation. So if an inmate in special circumstances stabbed another inmate or was in a fight, he could be classified and raised to a higher and more restrictive level, which would be administrative segregation. If he was in severe jeopardy of his life in that unit, he could be moved to protective custody. The statute, however, says that that is up to the commissioner. And then in sub two of C, the commissioner may also modify for compelling correctional management or safety reasons, any condition of confinement, but he does have to include the management provisions from A through C, which would be the monitoring of the movements, the cell searches, changing the cell and so forth. So there is some discretion, but it's not the full discretion that the commissioner might enjoy under Connecticut General Statute 1881, his general authority to classify. And as you understand it, that's what Mr. Reynolds is looking for. He wants to be generally classified under the general system. That's correct. And I believe he wishes to remain in a single cell. He indicated that when he was interviewed after the injunction entered. Okay. Thank you. That's all I have. Thank you, Your Honor. Thank you, Mr. Strong. I have some questions. Perhaps informed by the fact that, as I think you know, I, as a district judge, had most of the prisoner overcrowding cases. Yeah, yes, Your Honor. I remember, Bart, we litigated that before, Your Honor. Yes. Well, let me begin by following up on Judge Hall's question, what I took to be his question, which is that, assuming that the plaintiff prevails here in just some hypothetical scenario, it is nevertheless your view that the preliminary injunction is overbroad. Is that right? Yes, Your Honor. And I think you answered Judge Hall's question, but at the risk of repeating it, what is it that the district court could have done had it found in favor of Mr. Reynolds, what sort of decree might it have entered, which, in your view, would not be overbroad? But, and I'm asking you this, I understand fully that you don't think that any such order should enter, but I'm just trying to understand your views with respect to the question of overbreadth. Okay, so I'll go through each paragraph, if I may, Your Honor, of the permanent injunction order. So paragraph one says, the commissioner's enjoined from placing Reynolds in high security status. For example, if the commissioner did the regular classification review and determined when they searched Mr. Reynolds' cell that he had all kinds of maps and escape plans, and the commissioner determined that high security status was an appropriate classification, the commissioner would be enjoined from putting him in that classification, even though in his experience correctional judgment, that is the proper classification. So that's overly broad and intrusive. In paragraph two, there is no magic number of hours that in cell, out of cell, and especially in these times where the Connecticut Department of Correction is operating under COVID-19 emergency operations, there's a lot more in cell time because we're in an emergency to prevent the contagion of the disease. So there's no exception anywhere in the injunction for any kind of an emergency. But if there was a lockdown, the commissioner would be in violation of paragraph two. He would be in a cell more than 21 hours. A simple remedy would just simply be to give him, if the... Hello? Hello? Hello? Is everybody getting the message? Yes. Okay. I'm coming for you. Yes. This is it. I see many of the microphones. Thank you. Let's see. Whoever that was need not identify himself or herself, but please spare us the music. All right. Just in case this person is part of this case, I'll say that the number ends in 7788. So maybe you wanna mute that or call us back or something that you cannot control and just call back, I guess. Try to see what that person can do. 7788. Okay. That's helpful. So let's go back and the record will reflect that we had an interruption of about a minute or a minute and a half of music, which interfered with Mr. Strom's argument and he'll be given some compensatory time for sure. So go ahead, Mr. Strom, in response to my question. I apologize, Your Honor. For the record, my phone number does not end in those digits. Right, everyone. Everyone can. So I was on paragraph two of the injunction order. You asked about whether it was overly broad. Alone in the cell, I think if Mr. Reynolds, for example, a mental health clinician determined that there was a significant need for a legitimate mental health reason for Mr. Reynolds to have a single cell, this would prohibit Mr. Reynolds from being in a single cell. So it's like every paragraph interferes with the broad discretion that the commissioner has. Let me ask you, Mr. Strom. The next phrase, Your Honor. I'm sorry, go ahead. No, go ahead, Mr. Strom. Segregation from inmates who are not on special circumstances. That's almost telling the commissioner that Mr. Reynolds has to be commingled with general population inmates, even if it were not reasonably related to good correctional practice or legitimate penal. It's almost like saying, well, we'll mix in a maximum security inmate with minimum security inmates. They all have to be mixed together. The district court should not be prescribing. This is exactly what the Supreme Court in Louis v. Casey said is the knee plus ultra of micromanaging the minutia of prison operations. It should have just said, enjoin the enforcement of 1810B and allow the commissioner to classify Mr. Reynolds in his discretion following the normal classification procedures. And I would be surprised if Attorney Digman didn't disagree with that. I believe all the indications from the record is that Mr. Reynolds can be managed in general population and that he could be a good candidate for general population. But the court shouldn't tell the commissioner, for example, in paragraph five, that he should be housed in conditions similar to Santiago and Johnson. We know that Santiago and Johnson have double cells. They're in one particular facility. In order to comply with the order, the commissioner would have to put Mr. Reynolds in where they are. I believe they're at McNugle Walker facility in Suffield. Give them a commissary job that Santiago has. It makes no sense.  Well, I'm still here, your honor. I'm sorry, I had you on mute. Where did we meet? Where did you last hear from me, Mr. Strauss? I just, there was a little silence. I haven't heard any of your remarks after my remarks, your honor. I apologize. No, it's okay. It's not your fault at all. What I want to know is, I want you to think of the record, not to give me your opinion on this matter, but does the record reflect whether Mr. Reynolds wishes to be in general population? I believe it does. All right, I just want your help on that. That's all. Let me go back because in a way, some of these questions go back to procedure. Let me ask you about the proceedings before the district judge. Would you describe in short form what exactly took place? What kind of a hearing was held that led to the entry of the permanent injunction? There was a cross motions for summary judgment, and it was scheduled in April of 2019. I believe it was April 18th, 2019. The parties appeared in the Bridgeport District Court and Judge Underhill's courtroom. Attorney Dignan appeared with a number for certified legal interns from the Morningside Heights Legal Clinic. They were eminently prepared. Each one of them took one of five or six issues, and we argued cross motions for summary judgment before Judge Underhill. And then he took the case under advisement and issued the decision that he did. There was no evidentiary hearing, is that right? That's correct, Your Honor. It was all on the papers. Did you ask for an evidentiary hearing? You know, it was- I don't know what you're saying here, that you would wish to have such, but- It did not proceed by way of a motion for a preliminary or permanent injunction with an evidentiary hearing. No, it proceeded by what, that's why there's nine volumes of joint appendices. We tried to put in all the various moving and opposing papers in Rule 56 Statement. So it was all on the papers. It was all on the papers, but the papers must have spoken in terms of equitable relief and or a request or application for a permanent injunction, right? That's correct, Your Honor. Yeah. And why didn't you ask for an evidentiary hearing? We didn't know that there was one that was available. Well, I guess the way you might put it is that you didn't know that one would be needed because you thought that there were no material issues of fact that were in dispute. Is that your position? No, our position was that the facts were in dispute except for the question of law, which we moved for a summary judgment on qualified immunity. I see. So the only basis for judgment in your view would have been qualified immunity. Is that right? Right. We claim that there should be no money damages because these issues as Your Honor can tell from today's argument are novel and essentially sui generis. There's no case anywhere in the country that had the convoluted history of the legislation regarding the death penalty and then the judicial sort of abolition of the death penalty in 2015, when in Stacey Santiago, when that came down and then how to implement prison procedures when they never thought that this statute would become operative. Although it was passed in 2012, it didn't become operative until 2015. And then Mr. Reynolds didn't move to vacate and or move for it to correct in the legal sentence until April of 2017. Let me ask you, if Reynolds was moved to a general population, would he have an individual cell? There was a transition plan that was developed Your Honor by Dr. Burns and the warden. And that is in the record. There's an affidavit from Dr. Burns. The idea was to give him a single cell for a period of time as a sort of a transition or a step down and then eventually allow him to choose a cellmate and that eventually he would get a cellmate. Dr. Burns declaration is in joint appendix 2249. This was part of the proceedings after the injunction entered. The injunction was in August and his declaration is in September 25. But Dr. Burns wanted to have a transition that was sustainable for Mr. Reynolds such that he could adjust. And as your honors can imagine, being in a single cell for 20, now it's 25 years from 1995 to the present. And in general, paragraph four, Dr. Burns said, it's important to evaluate Mr. Reynolds to provide for a safe, durable transition to general population if appropriate for individuals currently in status of special circumstances. So the thought was to give him either six months or nine months and he wanted to interview him and conduct some sort of mental health support at page 2252 of the record. The plan includes after six months, Mr. Reynolds would be offered to have continuing mental health sessions. They offered him mental health. So they had a plan in the event that your honors court did not enter a stay but a stay entered and so everything was put on hold. That was entered by a three judge motions panel, right? That's correct. Initially it was entered by a single judge, Judge Bianco and then it went to a three judge panel. So the stay is still in effect. Right, that was Judge Pooler, Judge Lohier and Judge Hall, I guess. And that stays in effect. So let me, going to the record again, would you just describe for us very briefly, what is described hit the special circumstances unit? What does it look like, you know, architecturally and in terms of the day-to-day administration of that unit? So your honor, it's not a whole housing unit. The housing unit has about 50 cells and there's only 10 inmates who are in this status. So they, it's a long hallway, concrete cells. The description of the cells is pretty accurate. There's a slot on the front door, a narrow window in the back. Hold on a second, this prison, this prison facility, is it the most modern facility in the system in Connecticut or one of them? Yes, your honor. It was built right across the parking lot from what used to be Summer State Prison, where I know your honor has toured. It was opened in 1995. It has modern heating ventilation. In fact, today it's being used to isolate the positive COVID patients because the ventilation system is similar to negative pressure rooms. All the air is circulated out of the building, but it does have solid concrete walls, concrete floors. It has a large day room. So when the special circumstances inmates are out because of the statute, the other inmates are locked in their cells. There could be other inmates in the unit that have different kinds of status. Does Reynolds have the ability to communicate with other inmates? He does, your honor. When he goes out in the middle of the unit, there are stainless steel tables with stools and he has day room recreation for an hour. Right now it's an hour and a half in the morning, an hour and a half in the afternoon. They go out to a rec yard for an hour and all of those activities are available for all the special circumstances inmates. So as many as eight or nine inmates can come out. Solitary, that is the regular exercise and outdoor recreation involves more than one person? That's correct, your honor. Three times a week they go to the gymnasium. They have gymnasium rec and they go together. Six or eight of those. What does the record show? The record shows that they go out in groups and they've been going out in groups for the last four or five years, at least since 2016, I believe. And when you say groups, how many people are we talking about? We're talking about, right, today it's as many as six or eight at a time. I believe at one time they went out in two groups, four at a time. They're still on the record? Yes, your honor. And are there any claims of denial of adequate or appropriate food or clothing or shelter? The only claims related to shelter is I read in the brief, Mr. Reynolds claimed there were some plumbing problems that his toilet backed up. When the cell on the other side of the wall, if they stuffed clothing or sneakers in the toilet and they pumped the flusher a number of times, it pushed pressure in the cell. That was all in dispute. There were affidavits from the captain, Captain Robles, Gregorio Robles, said that Mr. Reynolds never complained about it and they had no work orders. So that was in the papers, but it was a fact in dispute. That was the only question about quote unquote shelter, but there's no complaint. Mr. Reynolds complained about cold, that the temperatures were unusually cold in the summer. There's record evidence of that, that was in dispute. Let me ask you another question about the record. The term solitary confinement is often used with some degree of ambiguity. Is it your view that whatever his status is under the current regime is different from solitary confinement? Yes, your honor. What is solitary confinement if not this? What would it involve? Let's assume for the argument that it was determined that Reynolds should be in solitary confinement. How would his life be altered? That's a good question, your honor. What I'm envisioning is that one of my favorite prison movies with Steve McQueen and Dustin Hoffman, Papillon, where Steve McQueen sticks his head out the box, a dark hall with no light, crawling around the floor for cockroaches, no sensory stimulation. I don't think any of those conditions exist anywhere except in the French penal colony. The case law seems to say solitary confinement means no human contact, no communication with others, no property in the cell. The Williams case from the Third Circuit says no property, no radios, no television, no telephone calls, no socialization whatsoever. That- Does Reynolds have all of that? He does. He does. He's always had radio, TV, headphones, audio books, video games, large amounts of reading material, legal material. He's always had- What about recreation in addition to athletic stuff? Are there any other situations where Reynolds, that the records suggest that Reynolds can interact with others? Do they play cards or anything of that sort? Yes, Your Honor. Mr. Reynolds was observed by Dr. Sadoff in his expert report, playing cards, sitting at a table with other former death row inmates, Daniel Webb, Ashby, Rizzo, Campbell. And I mentioned that in my opening argument. They play cards. The loser goes on the ground and does pushups. That was all observed firsthand by Dr. Sadoff. And that's why he stated in his declaration and in his report that this is not solitary confinement. Solitary confinement, arguably, if they come out of their cell, there's no contact with any other inmates. They're the only one out. They're out by themselves. I see. Hold on one second. Maybe you could address very briefly, why is this not a bill of attainder, given that the statute at play here that was adopted by the General Assembly of Connecticut, and there were very specific references to Reynolds in the course of the legislative process. The legislative history. Your Honor, in this court's decision in Acorn versus United States 618, I believe you may have been on the panel in that case. This court said that the legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder. Statements by a smattering of legislators do not constitute the unmistakable evidence of punitive intent. So it's not a bill of attainder because Mr. Reynolds firstly was convicted by a jury beyond a reasonable doubt. So he did have the safeguards of a judicial trial. The Supreme Court, for example, in Lovett, said that it would be punishment of an individual without a judicial trial. That was government employees that couldn't work for the government and the legislation punished them by taking away their livelihood because they were suspected of being communists because the legislature found them guilty. None of the bill of attainder consequences applied because Mr. Reynolds was not found guilty by the legislature. He was already adjudicated guilty by a jury. And the- Is it not the case that some of this information about the conditions of confinement were not matters of record, or at least that they're placed before us for the first time on appeal? For example, I believe it's the case, but you correct me if I've got it wrong, that the defendants now state that those persons confined in a special circumstances unit are allowed out of their cells for four and a half hours per day. Was that a matter of record to begin with, or is that a new development that we can take, we can become aware of? It is in the record in connection with the state proceedings, Your Honor. It was not in the record before Judge Underhill when we argued the case in April. When we argued the case in April, the fact was that Mr. Reynolds had three hours out of cell time a day. But after the injunction entered, Warden Madonna was instructed by Commissioner Cook. So in the record at Joint Appendix 2248, and in the warden's declaration, in connection with the state proceedings, the warden immediately, once the injunction ordered, added a half an hour of recreation time to each recreation period. So the easiest thing for the facility to do was instead of an hour of rec and an hour of rec, they had an hour and a half and an hour and a half. So that was three hours. And then two half hours for lunch was four hours. They all- None of this is really disputed, is that right? So it's a matter of record, but not in the record before Judge Underhill. It was not in the record before Judge Underhill. That's correct. And I think today it's even more sort of normative towards general population. I believe they've offered religious programming groups. They've offered a Lifert group. I don't know whether any of that is in the record, but that's in the warden's declaration that additional group programming was being offered. And her declaration says he had four and a half hours, in part because we didn't know if a stay was going to enter. And one of the paragraphs said he could not be in a cell for more than 21 hours. So in an effort to comply with the injunction while at the same time moving for a stay, the commissioner and the warden added some out-of-cell time. How long has the stay been in effect now?  in the special appendix, Your Honor, when Judge Bianco entered his single order, which was dated August 27th, 2019. August 27th, 2019. But in effect, it's ever since the decision came out, which was August 8th, 27th of 19. It's fair to say the injunction has never really gone into effect. That's correct, Your Honor. Yeah. It was planning for it, but it never went into effect. Yes. Now, let me turn it very quickly. I'm sorry to take so much time, more time than we envisaged, but what do we have in the record about whether the defendants, the DOC officials of various ranks were in a position to make decisions about changes in the conditions of confinement of rentals? I suppose that may have some relevance to the issue of qualified immunity, but maybe not. What's your view on that? Does the record show, if anything, about the ability or the time or the authority of the DOC officials of various ranks? I suppose we're talking about those officials below the level of the commissioner. Does the record show us anything about what authority they had to make decisions about the rentals conditions of confinement? I believe it does, Your Honor. From 2010 to about 2016 or 17, there was a restraint policy at issue. And so prior to these last four years, individuals were in fact recreating by themselves one at a time. And when they went from their cell to the recreation area, they were in handcuffs. So the warden had discretion, for example, to change how many inmates would recreate at a time, whether they recreated alone, two at a time, four at a time. There's a memo in the record, Joint Appendix 1037, from the Deputy Commissioner, then Deputy Commissioner Mark Strange to Brian Murphy. Talking about various conditions and incidents in the history of the prison and restraint. Initially this case was, there were two cases in the district court. One that dealt just with the restraint policy and then this general case. And then Attorney Dignam and Judge Underhill decided we'd have one rentals case with all of the conditions. But this, as the case went to summary judgment and now on appeal, Reynolds is disavowing any claim for money damages except for the issue of due process and not getting periodic due process hearings. The district court decision that talks about 23 years, the plaintiff only moved for summary judgment as the injunctive relief. So all this past history in the defendant's view, Your Honor, is really not relevant or material because they were only moving for an injunction as to what was the imminent injury as of the date the case was argued in April of 2019. And by April of 2019, those restraint policies had long been abandoned and people were recreating together in groups. And that's what Dr. Sadoff observed when he went to the prison and wrote his expert report. And that was part of the record, was it? Yes, Your Honor. Dr. Sadoff's report is at 272 to 292 of the joint appendix. It's the beginning of volume two of the joint appendix. Yes, yes. Okay, very good. Thank you. I've exhausted my questions for the moment and let me just turn quickly to my colleagues to ask whether any of this prompts them to ask any questions. But if not, we'll ask Ms. Bignam to take the floor as it were. Judge Kears, any further questions? Judge Kears. I hope we haven't lost the connection here. No, no questions at this point. Okay, great. Paul. No questions, thank you, Judge. Okay, fine. Let's hear from Ms. Bignam. Thank you, Your Honor. May it please the court. My name is Brett Bignam and it is my privilege today to represent Richard Reynolds in these important constitutional claims. I'm mindful of the lateness of the hour, Your Honor, but I'm going to take you up on your invitation to provide at least some framing for these issues. And then I will turn to some things which I think I can clarify about the record. It is poignant to argue constitutional claims based on social isolation and the extraordinary circumstances that bring us together on the telephone rather than in a courtroom. Weeks of forced social distancing have taught us not only the physical and mental health challenges of isolation, but the value of human contact. And that's exactly what this case is about. This case is about the deprivation of human contact and environmental stimulation necessary for human development and more specifically for the preservation, as neuroscientists have just established, of a healthy brain. Mr. Reynolds has lived alone in a concrete 12 foot by seven foot cell in segregated housing at Northern, the only maximum level five prison in Connecticut for over 24 years. It is an institution that affords no interior natural light or direct fresh air and is constructed of concrete, forged steel and reflective glass. Under defendant's policies, Mr. Reynolds will never touch a friend or loved one and will have minimal opportunity for social interaction, meaningful environmental stimulation or occupation for the rest of his life. In 2010, after 12 years without a single disciplinary infraction, defendants placed Mr. Reynolds in high security restraints. He continued to live, eat and recreate alone, but every time he left his cell for seven years, he was strip searched and placed in restraints. Although administrative directive 9.4 requires notice and regular review of that status, Mr. Reynolds had neither. And your honor, with respect to the two different actions, I just wanted to clear up the procedural history for a moment if I might. There was an initial motion for summary judgment brought by defendants before I was of counsel in this case in March of 2015. That's in the district court record at ECF 42. At that point, Mr. Reynolds had been living alone, eating alone, recreating alone for a long time. And in the defendant's view, the case was right for summary judgment. There were no disputed facts at that point according to the defendant. Then I became involved. They graciously agreed to suspend the motion for summary judgment until I had an opportunity to investigate the facts and the law. As Mr. Strom has said, it took a while for Mr. Reynolds to get resentenced. He had a live habeas at that point and was trying to address the death penalty claim that he had, which would have avoided placement in special circumstances. That did not work out. There was then a motion to correct his illegal sentence. As soon as that happened, we amended the complaint. That's at ECF 71.1 in the district court file. And it was at that point that we recognized there was another action, the so-called restraints case, which deals with the period I just described from 2010 to 2017. A little bit further down the line after we'd done some discovery, but not full discovery, the other case popped up for trial. I agreed to get involved. We did not think it made sense to try a subset of the case at that point. So we agreed to fold the pleadings from that case into the larger case. And that's how we have both of those cases before you today.  The defendants moved for judgment as a matter of law on all claims, not just on qualified immunity. Mr. Reynolds moved for partial summary judgment. He moved for injunctive relief on most of the claims, but for a finding about the smaller restraint case. That's in ECF 119 at the district court level. And there were extensive filings there. There were disputed facts. There is a long joint statement of undisputed facts that was largely taken from the earlier summary judgment motion filed by the defendants. In 2017, Mr. Reynolds was resentenced to life without possibility of parole and was reclassified as special circumstances, high restraint status. That's the term in the statute. Pursuant to Connecticut General Statute 1810B. Relying on defendants pleadings, the district court found that other than limited recreation time, professional or legal visits and short increments of time to eat or shower, Mr. Reynolds would spend the remainder of his life alone in a small cell. There were no further changes to his schedule until the day after the injunction. So the pleadings that were filed in connection for the motion per se was the very first time that anyone was alerted to the possibility that there would be more out of cell time. Dr. Satoff had done his tour and issued his report a year earlier. And during his deposition had said the conditions were evolving but they evolved not one bit in that year. Every change that has been made to Mr. Reynolds conditions of confinement has been made during this litigation. And in response, I would submit to certain activity in the litigation. I'd like to start with a bill of attainder claim since your honor asked some questions about it. We've briefed it at some length and there's an amicus brief. So I'm not going to spend a lot of time on it. The Connecticut legislature specifically targeted Mr. Reynolds for retrospective punishment, life without possibility of parole in mandated and permanent social isolation. They're explicitly vindictive and punitive motivation and the complete absence of any non-punitive rationale for imposing punishment that was based on conduct that occurred more than two decades earlier demonstrate that 1810B is an unconstitutional bill of attainder. There was no question that Mr. Reynolds and the others on death row were specifically targeted. They were identified as people who had committed a capital felony prior to April 25th, 2012 and were in DOC custody. There's really no dispute about that. That's in subsection A2 of the statute. As this court is well aware from its involvement in ACORN and other cases, there are three tests developed by the Supreme Court to determine if a statute is punitive. The motivational test looks to the legislative history. And while it is sometimes the case that there's conflicting legislative history or confusing legislative history, it could not have been more clear in this case. Every single legislator who talked about the proposed amendment talked in terms of its ability to punish and talked quite specifically about the people whom they wanted to punish. It also meets the requirements as we've discussed in our brief of the functional test and the historical test. Of course, it's not necessary to meet every test. One test is enough. If there is stark, clear punitive intent, which we submit in this case there is, that is certainly enough. The defendants have argued that there was no judicial review relying on the conviction 17 years before. Judge Underhill properly rejected that rationale. It could simply not be the case that a trial 17 years earlier is some sort of review prior to the legislative imposition of punishment. And that's all I'll say for the moment about bill of attainder. I'd like to turn to the due process claim. As I've mentioned before, there are two, but I'm only gonna focus now on the permanent injunction, which is aimed at Mr. Reynolds' current conditions. And of course those are in special circumstances status. The defendants have imposed a permanent punitive set of circumstances on Mr. Reynolds that constitute an unreviewable hardship in violation of his 14th amendment due process right. When the district court issued its decision and entered a permanent injunction, Mr. Reynolds had lived for over 24 years in segregated housing at Northern, where he was deprived of almost any environmental or sensory stimuli and almost all human contact. And that is what Wilkinson versus Austin specifically found to implicate a liberty interest. Built as a supermax facility, Northern is a level five segregated housing facility that provides the most austere conditions found in Connecticut prisons. Defendants assert that Connecticut general statutes 1810B require them to impose lifelong limitations. No more than two hours of recreation per day, no contact visits with family, no work assignments outside the housing unit, isolation from anyone who is not on special circumstances status, which means at this point, Mr. Reynolds has the possibility of talking to eight other people. As was briefed at the district court level, Cedric Cobb is one of those people he has not come out of his cell in years. Dr. Gagne testified during his deposition that there were two people being maintained on psychiatric medication that were part of that unit. The Supreme Court announced in Sandin versus Connor and further explained in Wilkinson versus Austin that confinement and conditions of extreme social isolation implicate a liberty interest that requires due process under the 14th Amendment. Sandin teaches that analysis does not turn on the mandatory or discretionary language of prison regulations, rather the touchstone of the analysis is whether conditions of confinement impose an atypical and significant hardship in relation to the ordinary incidents of life, prison life. This court has emphasized that duration of confinement is a central consideration, first in Welsh and then in Palmer versus Richards and announced the confinement of 305 days in segregated housing is definitively atypical and that's Cologne versus Howard. Since Cologne versus Howard, the circuit has held the line at the 305. Mr. Reynolds had been in segregated housing for more than 2,500 days when the injunction entered. That confinement is not only indefinite, a factor the Wilkinson Court emphasized, it is permanent. This court has also repeatedly held that the ordinary incidents of prison life require comparison to people held in general population. Again, that's Welsh and Palmer. The affidavits of Eduardo Santiago and Terry Johnson document that general population prisoners in Connecticut, even those who were once sentenced to death have many more opportunities to interact with each other. They have regular access to natural light and open air outdoor activities, programming, employment, intramural sports and the opportunity for more frequent and extended family visits where contact is permitted. With respect to the process that is due, I would refer this court to the relatively recent decision in Almighty Supreme Born Allah, where Judge Lynch looked at actually administrative segregation at Northern and found that a practice of the DOC where they took someone who'd been in ADCEG was released to the general public and came back into the institution. And he was looking at whether that implicated a liberty interest, the court there held that it did and noted specifically that there had been no individualized or specific finding of risk, that there had been no real determination of the individualized assessment that ADCEG was appropriate and concluded that deference did not relieve officials from the requirements of due process or permit them to impose restrictive measures that are not reasonably related to legitimate government purposes. There's absolutely no evidence in this record that Mr. Reynolds is anything other than as Dr. Satoff referred to him, a model inmate. Defendant after defendant identified him as somebody they could manage safely in general population. Mr. Reynolds is also alleged and Judge Underhill found that there was an Eighth Amendment violation that the condition specifically at Northern that he had been subjected to of extreme social isolation, in fact violated the cruel and unusual punishment clause of the Eighth Amendment. The reason given and the reason that was accepted was that the confinement itself poses a substantial risk of serious harm to his future physical and mental health. That is well supported and in fact has been noted by the Supreme Court of the United States, this court and several circuit courts. It is based on scientific literature and professionals across disciplines. That risk is now documented by an overwhelming body of scientific literature. The conditions are inhumane, degrading and violate contemporary standards of decency. They do that because the very fact of isolation, the deprivation of fresh air, the deprivation of natural sunlight, the isolation from all but a few human beings has been demonstrated by medical researchers, by sociologists, by psychologists now for decades to cause serious physical and mental harm. The recent neuroscience research which is contained in the new book, Solitary that's cited in our brief does an excellent job of updating the court on what the most recent thinking is. But this goes back to Dr. Grathian's original article in 1983, this is not a new finding. This is a finding that people have confirmed over and over again through the decades and it is not research based solely on prison isolation. It is isolation in different contexts, including astronauts, including prisoners of war. There are not only a scientific literature and an extensive amount of that, there has been great deal of public awareness as these things are documented. All of that satisfies the objective element required to prove an Eighth Amendment violation. Excuse me, you have one minute left. Thank you. The subjective element is satisfied because the risk is obvious. The litigation puts the defendants on notice so that's Farmer at footnote nine. And the defendants admit they're aware of the literature and the deleterious effects that can be caused by subjection to the very conditions that Mr. Reynolds has been suffering. And with that, your honors, I'm happy to address any questions. Thank you very much. Judge Kirsten. No questions, thank you. Judge Hall. I don't have any questions at this time, thank you. I have just a simple, relatively simple question, Ms. Stigman. I jotted down a phrase you used, which is, quote, alone in his cell. Everything I heard from Mr. Strom, which I believe he rested, he was resting on material in the record, suggested that he has not been spending time, quote, alone in his cell.  Or did I misunderstand? Yes, your honor. Well, I have disagreements with Mr. Strom about the status of the record. Specifically, there are extensive affidavits from my client which have not been refuted that were submitted in support of summary judgment, both of which are in the joint appendix that document very specifically what the conditions of his confinement were at different times. So from 1999 to 2016, he was alone in his cell except the hour he went out alone for outdoor recreation. First, it was five days a week, and then it was six days a week at a certain point. He was alone for another hour in the day room. He ate all of his meals in his cell. That continued from 1999 up through 2016. In 2016, the defendants added, and this is all spelled out in great detail in his affidavit, they added two 15-minute meal increments. A couple of months later, they added two hours in a gymnasium for the first time he was allowed to recreate with other people, first in the outdoor area off of the housing unit. They had had separate rec yards constructed within the one relatively small concrete and steel mesh yard. They put up barriers. They then took down one of those barriers so two or three people could be in those places together. And then eventually, and I believe it wasn't until 2018, January of 2018, that they opened up the gymnasium, which at that point, my client had never seen. So his affidavit is in the joint appendix at 598 to 609, and it spells out all of this. At the time of oral argument on the summary judgment, at the time of the- I'm sorry, what were those citations to the appendix? Sure, so my client's affidavit is at 0598 to 0609. That's his opening affidavit, and then he submits a supplemental declaration after we get a response to the undisputed facts, and that is found in the record at 1977 to 1984. Thank you. All right. And so it is quite specific about exactly when those changes are made. At the time of the permanent injunction, he had four hours of outdoor recreation in the rec yard, two one-hour periods in the gymnasium. So we had a total of six hours, but in getting the gym, he lost a third of the fresh air that he had had up until that point. And he had another hour out in the day room with whoever wanted to come out from special circumstances. My understanding is that was usually four or five people, and that was what he had. It wasn't until the day after the injunction, when, according to Warden Mudano, actually filed two declarations. One was in connection with the motion for a temporary stay at the district court level, where she said she'd given the half hour that Mr. Strahm referred to, and she also said she offered contact visits to Mr. Reynolds with his family. It's nine months later. That has never happened. When they moved for stay pending appeal a couple of weeks later, she filed another declaration, and that's where the chart was attached that had a description of additional out-of-cell time and programming. As this court mentioned, that is outside the record. It is not properly something before this court. Those facts are disputed and should not be considered in evaluating whether the district court was correct in entering the permanent injunction. As I mentioned before, the defendants had well over a year to make any of those changes and nothing was done until the permanent injunction entered in this case. Let me ask you, if as a result of this litigation, Mr. Reynolds is moved to so-called general population,  is that something that the record suggests is agreeable to him? Your Honor, Mr. Strahm gave you a very specific site to Dr. Burns' declaration, which I commend to your attention. I believe it's at the Joint Appendix 2249, and it's a very thoughtful document that talks about the steps that they intend to take, which includes that they were going to put him in a single cell for at least six months, and they were gonna monitor his transition because after being alone in a cell for 24 years, they were concerned, which in and of itself speaks to the conditions in which they have been finding him but put that to the side, they're definitely, from talking to experts who do this and from talking to Dr. Grafian who looked at that plan, he said it was a good start, but we would certainly wanna talk to the defendants about what their plan was. But I understand that eventually, and he understands that eventually, it is highly likely that he will be double-celled, and that's gonna be a tough transition. Thank you very much. Let's hear from Mr. Strahm, who's reserved five minutes. Mr. Strahm? Are we still connected here? I'm still here, Your Honor. Yes, Judge. I apologize, Your Honor, when Attorney Dignam was speaking, I put my mute button on, I apologize. Oh, no, no problem, I understand. That's my fault. I apologize. May I proceed, Your Honor? Please, five minutes. Thank you. Thank you. Attorney Dignam indicated there's no fresh air, but then she said he's out in the rec yard for four hours. With regard to your specific question, Your Honor, whether or not he was alone in a cell, yes, he's alone in a cell because he's assigned to a single cell. But when he comes out in the day room, the day room has tables which seat four seats, and he can play a four-player card game, and that is clear. The conditions in every facility vary greatly. Programs were offered to Mr. Reynolds throughout the period of time, and Mr. Reynolds consistently declined to participate in the program. The chaplain proposed a religious services program for in the unit. Now, the statute, 1810B, limits recreation to two hours, but there are no limitations on additional programs that can be offered in the housing unit. So when the chaplain went to Mr. Reynolds and said we're proposing a religious, multi-denominational religious studies group or whatever, Mr. Reynolds declined. When Dr. Frane offered mental health groups, Mr. Reynolds declined. So there were additional opportunities. The statute says two hours of recreation. There were attempts to evolve the conditions, but they never came to fruition, in part because the inmate population in special circumstances did not want to participate. Attorney Dignam mentioned the Almighty Spornes-Alaa case versus Milling. That was a case that my colleague, Assistant Attorney General Steve Barry argued. That case stands for the proposition that should apply in this case, that the defendants are entitled to qualified immunity because that was a case where an offender was in a gang and was classified to a security risk group. He discharged from custody because the sentence ended. He went out into the community, and when he came back in, they put him right back into the gang program, and the court found that that was a due process violation for two reasons. He didn't get a hearing, but also because at the time when he came back in, he was an unsentenced pretrial detainee. So if that case stands for anything, it stands for the proposition that these due process questions are complex. And we know from Matthews versus Eldridge, due process is a flexible concept, and it's very, very difficult to understand what type of due process applies in which situation. The defendants respectfully claim that Mr. Reynolds was not in this extreme social deprivation. He had multiple, multiple professional visits from attorneys with all kinds of litigation. Whenever he went to see his attorneys, he was not in restraints. And quite frankly, all of that prior history about being in restraints and the restraint policy is not relevant because the plaintiffs did not move for money damages based on being in restraints for five or seven years. The plaintiffs moved solely for an injunction, which should consider what the conditions were on the day of the hearing, because injunction deals with an immediate irreparable injury at the time. So the district court erred in the very first paragraph, the first sentence, 23 years in solitary confinement. The 23 years was not corrected. There was no reason to consider that. The district court should have considered the affidavits, for example, of Captain Robles, which made it clear that he went to recreation with other inmates, played cards with other inmates, had meals with other inmates, and all of those were the conditions that- Excuse me, could you have one more minute? Thank you. The district court made all kinds of credibility findings and found facts not in favor of the defendants when it's clear on the summary judgment record, any dispute as to the facts and any doubt as to the facts should have been considered in the light most favorable to the defendants. So for all the reasons we've stated this afternoon, the summary judgment order should be vacated. The permanent injunction order should be vacated. And if the court does not direct judgment in favor of the defendants on all counts, it should be, the case should be remanded for further factual findings and proceedings because there are material facts and disputes. The defendants are entitled to qualify to be viewed as a matter of law. And for all those reasons, Your Honor, the judgment or the decision should be vacated as well as the permanent injunction order. Thank you for your patience for this long argument. Thank you, Your Honor. Judge Verano. Judge Hall is here, Maria. I don't... I see him, that he's connected to the call, but... Okay. Maria, he may be on mute like I was. I apologize for that, Judge Hall. No problem. I'm sorry, I'm on mute myself, oh my God. Yeah, is Judge Kearse there? Yes, I'm here. I'm not on mute. For sure, for sure. Any questions on your report? No questions, thanks. You'll be happy to know that while I had my phone on mute, I must've asked you four times. So I get some sort of credit. I'm not sure which way it works, some sort of credit. Yeah. Okay, Judge Hall, any further questions? No, thank you. All right, we'll reserve decision and we are adjourned. Thank you. Court is adjourned.